## UTAH POWER & LIGHT CO. *v.* PFOST, COMMISSIONER OF LAW ENFORCEMENT, ET AL.

No. 722.   Argued April 13, 1932.—Decided May 16, 1932.

166

*Mr. John F. MacLane,* with whom *Mr. Robert H. O'Brien* was on the brief, for appellant.

168

170

*Mr. Sidman I. Barber,* Assistant Attorney General of Idaho, with whom Messrs. *Fred J. Babcock,* Attorney General, and *Maurice H. Greene,* Assistant Attorney General, were on the brief, for appellees.

172

174

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The Utah Power & Light Company is a Maine corporation doing business in the states of Idaho, Utah and Wyoming, under the laws of those states. The corporation is a public utility engaged in generating, transmitting and distributing electric power and energy for barter, sale and exchange to consumers in each of these three states and in interstate commerce among them. The present suit was brought to enjoin the enforcement of an act of the Idaho legislature, levying a license tax on the manufacture, generation or production, within the state, for barter, sale or exchange, of electricity and electrical energy. Laws of Idaho, 1931 (Extraordinary Session), c. 3.

Section 1 of the act provides that any individual, corporation, etc., engaged in the generation, manufacture or production of electricity and electrical energy, by any means, for barter, sale or exchange, shall, at a specified time, render a statement to the Commissioner of Law Enforcement of all electricity and electrical energy generated, manufactured or produced by him or it in the state during the preceding month, and pay thereon a license tax of one-half mill per kilowatt hour, " measured at the place of production." Sections 2, 3 and 4 provide for the time and method of payment of the tax and the furnishing of appropriate information. Section 4 further requires the producer to maintain, at the point or points of production, suitable instruments for measuring the electricity or electrical energy produced. Section 5, which is the subject of a distinct attack, provides:

"All electricity and electrical energy used for pumping water for irrigation purposes to be used on lands in the State of Idaho is exempt from the provisions of this Act, except in cases where the water so pumped is sold or rented

to such irrigated lands. Provided, the exemption here given shall accrue to the benefit of the consumer of such electricity or electrical energy. Provided further that the full amount of such license tax which would have been due from such producers of electricity and electrical energy, if such exemptions had not been made, shall be credited annually for the year in which the exemptions are made on the power bill to the consumer by the producer of such electricity and electrical energy, furnishing such power, and such producer shall include a statement of the amount of electricity and electrical energy exempted by this section, furnished by it for the purpose of pumping water for irrigation purposes on lands in the State of Idaho, to the Commissioner of Law Enforcement of the State of Idaho as a part of the statement required by Section 1 of this Act, together with a statement of the credits made on the power bills to the consumers of such electricity and electrical energy for the pumping of water for irrigation to be used on lands in the State of Idaho."

Section 8 imposes a penalty for any violation of the act. or failure to pay the license tax provided for therein when due, in the sum of three times the amount of the unpaid or delinquent tax, to be recovered by civil action. Section 11 provides that if any section or provision of the act be adjudged unconstitutional or invalid, such adjudication shall not affect the validity of the act as a whole or of any section or provision thereof not specifically so adjudged unconstitutional or invalid.

After the filing of the complaint an interlocutory injunction was granted, 52 F. (2d) 226; and, thereafter, appellees answered. Upon the evidence reported by a master, to whom the case had been referred, the court below (composed of three judges as required by law) made findings of fact and conclusions of law and entered a final decree dissolving the interlocutory injunction and

requiring appellant to pay the tax in question with interest, but without any penalties which might have accrued during the pendency of the suit. 54 F. (2d) 803. This appeal followed.

The validity of the act under the federal and state constitutions is assailed upon four grounds: (1) that it imposes a direct burden on interstate commerce in violation of clause 3, § 8, Art. I of the Federal Constitution; (2) that it denies appellant the equal protection of the laws and deprives it of property without due process of law in violation of the Fourteenth Amendment and of a corresponding provision of the state Constitution, in that § 5 of the act compels the appropriation and payment of money by appellant for the benefit of private individuals, and that, § 5 being unconstitutional, the act as a whole must fall; (3) that the act violates § 16, Art. 3 of the state Constitution, which provides that every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; (4) that the act is so uncertain and ambiguous in specified particulars that its enforcement is left to arbitrary administrative action without a legislative standard, and thus violates the due process of law clause of the Fourteenth Amendment.

*First.* Appellant contends that the tax is not one on manufacture or production or on the extraction of a product of nature, but on the transfer or conveyance of energy in nature from its source to its place of use; that in part appellant's system consists of generating stations in Idaho and transmission lines across the boundary into Utah, and thence to various consumers, the combined action of which constitutes an operation in interstate commerce; that the energy is brought to the consumers in Utah directly from its source in the water fall; that thus the generator is an instrumentality of interstate commerce; that the process of generation is simultaneous and interdependent with

that of transmission and use, and because of their insepa-
rability the whole is interstate commerce; that since the
intent of the act is to tax the whole business, and no pro-
vision is made for the separate determination of inter-
state and intrastate business, the act, in burdening inter-
state commerce, is void in its entirety.

On the other hand, appellees say that the tax is laid
upon the generation of electrical energy as a distinct act
of production, and without regard to its subsequent trans-
mission; that the process of generation is one of convert-
ing mechanical energy into electrical form; that the re-
sulting change is substantial and is a change in the physi-
cal characteristics of the energy in respect of voltage, cur-
rent, and character as alternating or direct current, accord-
ing to the design of the mechanical generating devices;
that the process of conversion is completed before the
pulses of energy leave the generator in their flow to the
transformer; that the tax is measured by the amount of
electrical energy generated, without regard to its subse-
quent transmission; that such transmission is subsequent
to, and separable from, generation, and, in effect, corre-
sponds to the transportation of goods after their manu-
facture; that the generation of the electrical energy is
local, and only its transmission is in interstate commerce;
that since the tax is imposed in respect of generation, it
is not invalidated by reason of any intent on the part of
the producer to transport across state lines.

In the light of what follows, we find it unnecessary to
state or consider the claims of the parties as to the effect
of the interposition of the transformer between the gen-
erator and the places of consumption.

From the foregoing greatly abbreviated but, for pres-
ent purposes, we think sufficient statement of the views
of the respective parties, it is apparent that in the last
analysis the question we are called upon to solve is this:
Upon the facts of the present case is the generation of
electrical energy, like manufacture or production gener-

ally, a process essentially local in character and complete in itself; or is it so linked with the transmission as to make it an inseparable part of a transaction in interstate commerce? From the strictly scientific point of view the subject is highly technical, but in considering the case, we must not lose sight of the fact that taxation is a practical matter and that what constitutes commerce, manufacture or production is to be determined upon practical considerations.

Electrical energy has characteristics clearly differentiating it from the various other forms of energy, such as chemical energy, heat energy, and the energy of falling water. Appellant here, by means of what are called generators, converts the mechanical energy of falling water into electrical energy. Thus, by the application of human skill, a distinct product is brought into being and transmitted to the places of use. The result is not merely transmission; nor is it transmission of the mechanical energy of falling water to the places of consumption; but it is, first, conversion of that form of energy into something else, and, second, the transmission of that something else to the consumers. While conversion and transmission are substantially instantaneous, they are, we are convinced, essentially separable and distinct operations. The fact that to ordinary observation there is no appreciable lapse of time between the generation of the product and its transmission does not forbid the conclusion that they are, nevertheless, successive and not simultaneous acts.

The point is stressed that in appellant's system electricity is not stored in advance but produced as called for. The consumer in Utah, it is said, by merely turning a switch, draws directly from the water fall in Idaho, through the generating devices, electrical energy which appears instantaneously at the place of consumption. But this is not precisely what happens. The effect of turning the switch in Utah is not to draw electrical energy directly

from the water fall, where it does not exist except as a potentiality, but to set in operation the generating appliances in Idaho, which thereupon receive power from the falling water and transform it into electrical energy. In response to what in effect is an order, there is production as well as transmission of a definite supply of an article of trade. The manufacture to order of goods and their immediate shipment to the purchaser furnishes a helpful analogy, notwithstanding the fact that there the successive steps from order to delivery are open to physical observation, while here the succession of events is chiefly a matter of inference—although inference which seems unavoidable. The process by which the mechanical energy of falling water is converted into electrical energy, despite its hidden character, is no less real than the conversion of wheat into flour at the mill.

The apparent difficulty in perceiving the analogy arises principally from the fact that electrical energy is not a substance—at least in common meaning. It cannot be bought and sold as so many ounces or pounds, or so many quarts or gallons. It has neither length, breadth nor thickness. But that it has actual content of some kind is clear, since it is susceptible of mechanical measurement with the necessary certainty to permit quantitative units to be fixed for purposes of barter, sale and exchange. However lacking it may be in body or substance, electrical energy, nevertheless, possesses many of the ordinary tokens of materiality. It is subject to known laws; manifests definite and predictable characteristics; may be transmitted from the place of production to the point of use and there made to serve many of the practical needs of life.

We think, therefore, it is wholly inaccurate to say that appellant's entire system is purely a transferring device. On the contrary, the generator and the transmission lines perform different functions, with a result comparable, so

far as the question here under consideration is concerned, to the manufacture of physical articles of trade and their subsequent shipment and transportation in commerce. Appellant's chief engineer, although testifying that generation is a part of the process of transferring energy, said on cross-examination that in the process of generation there is a " conversion of the mechanical energy in the turbine shaft into a different form of energy, that is electrical energy. It must be converted into electrical energy before it can be transmitted . . . . This process of transformation is complete at the generator, and you have a greater amount of energy there, capable of doing a greater amount of mechanical work, at the generator than you do after transmitting it into Utah." The evidence amply sustains the conclusion that this transformation must take place as a prerequisite to the use of the electrical product, and that the process of transferring, as distinguished from that of producing, the electrical energy, begins not at the water fall, but definitely at the generator, at which point measuring appliances can be placed and the quantum of electrical energy ascertained with practical accuracy.

The various specific objections to the findings made below, and the failure to adopt others suggested by appellant, become immaterial in view of our conclusions. We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control over the manufacture. *Cornell* v. *Coyne*, 192 U. S. 418, 428–429. " Commerce succeeds to manufacture, and is not a part of it." *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12.

Without regard to the apparent continuity of the movement, appellant, in effect, is engaged in two activities, not in one only. So far as it produces electrical energy in Idaho, its business is purely intrastate, subject to state taxation and control. In transmitting the product across the state line into Utah, appellant is engaged in interstate commerce, and state legislation in respect thereof is subject to the paramount authority of the commerce clause of the federal Constitution. The situation does not differ in principle from that considered by this court in *Oliver Iron Co.,* v. *Lord,* 262 U. S. 172. There the State of Minnesota had imposed an occupation tax on the business of mining ores. The tax was assailed as being in conflict with the commerce clause. It appeared that substantially all the ores there in question were mined for delivery to consumers outside the state; and that the ores passed practically at once after extraction into the channels of interstate commerce. The greater part of the ores came from open pit mines, to which empty cars were run and there loaded, the ores being severed from their natural bed by means of steam shovels and lifted directly into the cars. When loaded these cars were promptly returned to the railroad yards from which they came and were there put into trains and continued their interstate journey. The several steps followed in such succession that there was practical continuity of movement from the severance of the ores to the end of their journey in another state. Upon these facts the court held that the commerce clause was not infringed.

" The ore does not enter interstate commerce," it was said, p. 179, " until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may indirectly and incidentally affect such commerce,

just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference."

In *Hope Gas Co.* v. *Hall*, 274 U. S. 284, this court considered an act of the State of West Virginia imposing a tax upon the production, among other things, of natural gas. The chief business of the Hope Gas Company was the production and purchase of natural gas in West Virginia and the continuous and uninterrupted transportation of it through pipe lines into adjoining states, where it was sold, delivered and consumed. Most of it passed into interstate commerce by continuous movement from the wells where it originated. Interpreting and following the decision of the state court, it was held that the tax was to be computed upon the value of the gas at the well, and that if, thereafter, executive officers should fix values upon an improper basis appropriate relief would be afforded by the courts. The tax was sustained as not involving an infringement of the commerce clause of the Constitution.

In the light of what we have said in respect of the character of the product here involved, the manner of its production, and the relation of such production to its interstate transmission, these cases in principle clearly control the present case and render further discussion or citation of authorities unnecessary.

*Second.* The attack upon § 5 of the act, which is copied on a preceding page, is based upon the contention that it does not grant an exemption but has the effect of laying a tax for the benefit of favored consumers, that is to say, of selected private persons; and that the enforcement of the section in respect of allowances of credits by the producer to the favored consumers will result in taking the money of the former and giving it to the latter. A further contention is that § 5 is an inseparable part of the act, and being unconstitutional, the entire act must fall

with it. In support of the latter point, the grounds stated are that the legislative history discloses as a matter of fact that the act would not have been passed had § 5 not been included; and that it is apparent on the face of the act itself that the provisions of the section are essential and inseparable parts of the act as an entirety. It will shorten our consideration of the first point if we begin by disposing of the second point as to the question of separability.

The claim that the legislative history discloses that the act would not have passed without § 5 seems to rest entirely upon the fact that a bill for a similar act, but which did not contain the challenged section, failed of passage; but that, upon § 5 being included, the act thereafter was passed. The bill first introduced did not come to a vote, but was withdrawn from consideration by unanimous consent. That it would have been rejected if put to a vote rests upon mere supposition. There is no real ground for an opinion one way or the other. Courts are not justified in resting judgment upon a basis so lacking in substance.

Nor do we think the inseparability of the section from the rest of the act appears from the face of the legislation. The act itself (§ 11) provides that an adjudication that any provision of the act is unconstitutional shall not affect the validity of the act as a whole, or of any other provision or section thereof. While this declaration is but an aid to interpretation and not an inexorable command (*Dorchy* v. *Kansas,* 264 U. S. 286, 290), it has the effect of reversing the common law presumption, that the legislature intends an act to be effective as an entirety, by putting in its place the opposite presumption of divisibility; and this presumption must be overcome by considerations that make evident the inseparability of the provisions or the clear probability that the legislature would not have been satisfied with the statute unless it

had included the invalid part. *Williams* v. *Standard Oil Co.,* 278 U. S. 235, 241–242.

It fairly may be assumed that the Idaho Legislature, in making this declaration, had in mind every provision of the act, including § 5. The primary object of the statute, under review, plainly, is to raise revenue. The exemption made by § 5 and the provisions for carrying that exemption into effect are secondary. We find no warrant for concluding that the legislature would have been content to sacrifice an important revenue statute in the event that relief from its burdens in respect of particular individuals should become ineffective. On the contrary, it seems entirely reasonable to suppose that if the legislature had expressed itself specifically in respect of the matter, it would have declared that the tax, being the vital aim of the act, was to be preserved even though the specified exemptions should fall for lack of validity. *Field* v. *Clark,* 143 U. S. 649, 696–697; *People ex rel. Alpha P. C. Co.* v. *Knapp,* 230 N. Y. 48, 60–63; 129 N. E. 202.

In the light of these conclusions, § 5, in respect of the constitutional question, stands apart from the remainder of the act and is to be considered accordingly. The court below followed the decision of the state supreme court (*Williams* v. *Baldridge,* 48 Idaho 618; 284 Pac. 203), in holding that § 5 granted an exemption ultimately for the benefit of the consumers of electrical power for irrigation purposes on lands within the state. It seems to us plain that the purpose of the act was to relieve the producer from liability for the tax *pro tanto,* and to pass on to the irrigation consumers the benefit thereof to the extent— and only to the extent—of the savings effected through the exemption. There is nothing to suggest that the legislature intended to cast any additional burden upon the producer or require him to yield to the irrigation consumers anything beyond the equivalent of the exemption. The irrigation of even private lands in the arid region is a matter of public concern (*Clark* v. *Nash,* 198 U. S. 361),

and we are of opinion that an exemption of the character here involved is not precluded by the equal protection clause of the Fourteenth Amendment. Compare *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 40.

The provisions in respect of the allowance of credits to the consumers by the producer present a question of more difficulty. If these provisions embody nothing more than a method of accounting to make sure that the irrigation consumers shall not bear, in whole or in part, the burden of the tax from which the producer is exempt, they would seem to be without fault. If by construction or in application they result in taking from the producer more than the sum of the exemption, a different question would arise. The supreme court of Idaho thus far has not construed § 5 in respect of the provisions now under consideration. The point was presented but reserved in *Williams* v. *Baldridge, supra,* p. 631. It does not appear that appellant is presently in any such danger of an unconstitutional application of these provisions of the statute as to entitle it to invoke a decision here upon the question, and the rule is well settled that " a litigant can be heard to question a statute's validity only when and so far as it is being or is about to be applied to his disadvantage." *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 289; *Oliver Iron Co.* v. *Lord, supra,* pp. 180–181; *Jeffrey Mfg. Co.* v. *Blagg,* 235 U. S. 571, 576; *Gorieb* v. *Fox,* 274 U. S. 603, 606. Primarily, the construction of these provisions of the statute is for the state supreme court, and we cannot assume in advance that such a construction will be adopted, or such an application made of the provisions, as to render them obnoxious to the federal Constitution. In *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 544–545, 546, Mr. Justice Pitney pointed out that

". . . in cases other than such as arise under the contract clause of the Constitution, it is the appropriate

function of the court of last resort of a State to determine the meaning of the local statutes. And in exercising the jurisdiction conferred by § 237, Judicial Code, it is proper for this court rather to wait until the state court has adopted a construction of the statute under attack than to assume in advance that a construction will be adopted such as to render the law obnoxious to the Federal Constitution." This was said in a case brought for review from the supreme court of a state, but the same doctrine was recognized in *Arizona Employers' Liability Cases*, 250 U. S. 400, 430, which came here on error to a federal district court.

*Third.* Section 16, Art. III, of the Idaho Constitution provides—" Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title." Appellant contends that the act now under review contains two subjects, (a) the levy of a license tax on electrical energy generated in the state; and (b) a subsidy (§ 5) in favor of irrigation pumping users. The purpose of the constitutional provision, as this court said in *Posados* v. *Warner, B. & Co.,* 279 U. S. 340, 344, " is to prevent the inclusion of incongruous and unrelated matters in the same measure and to guard against inadvertence, stealth and fraud in legislation. . . . the courts disregard mere verbal inaccuracies, resolve doubts in favor of validity, and hold that, in order to warrant the setting aside of enactments for failure to comply with the rule, the violation must be substantial and plain." We cannot agree with the claim that the violation here is substantial and plain. The statute levies a license tax and creates an exemption therefrom in specified cases. This exemption, although it inures to the benefit of third persons, and whether it be constitutional or not, is obviously a matter properly connected with the subject matter of the act. It is nothing more than a limitation upon the generality of the tax. The supreme court of

Idaho has laid down the proper rule in *Pioneer Irrigation Dist. v. Bradley*, 8 Idaho 310; 68 Pac. 295, to the effect that the purpose of the constitutional provision is to prevent the inclusion in title and act of two or more subjects diverse in their nature and having no necessary connection; but that if the provisions relate directly or indirectly to the same subject, have a natural connection therewith, and are not foreign to the subject expressed in the title, they may be united. Following this rule, we are of opinion that the objection is untenable.

It is further said that the subject of the act is not expressed in the title, since the title purports to levy a license tax on electricity and electrical energy generated, etc., for barter, sale or exchange, while the act requires payment of a tax upon such electricity and electrical energy generated, etc., in the state of Idaho for any purpose and measured at the place of production. The point made is that a tax on energy generated specifically for barter, sale or exchange, and a tax on all energy generated or produced in the state are entirely different things. The force of the contention depends upon the construction of the act. We are of opinion, as will appear more fully under the next heading, that the act, in harmony with the title, imposes a tax only upon the energy which is generated for barter, sale or exchange.

*Fourth.* Appellant contends that the act is so uncertain and ambiguous as to require arbitrary administrative action without a legislative standard, and thus take appellant's property without due process of law. The uncertainties said to exist are (1) that it can not be determined whether the tax is levied on all electrical energy generated or produced, or only on such as is generated or produced for barter, sale or exchange; and (2) that if the latter be the true construction, the act affords no guide for the determination of what electrical energy in fact is generated for barter, sale or exchange; but by fixing the

place and method of measurement it excludes the possibility of a determination of that matter. The same uncertainties are said to exist in respect of § 5.

We think the act is reasonably open to the construction that the tax is to be measured by the kilowatt hours generated or produced for barter, sale or exchange. The purpose, as manifested by the title, is to levy a tax " on electricity and electrical energy generated, manufactured or produced in the State of Idaho for barter, sale or exchange." The act itself in terms applies to those engaged in the production of electricity and electrical energy in· the State of Idaho " for barter, sale or exchange." The producer is required to render a statement and pay a license " on all such electricity and electrical energy so generated, manufactured or produced, measured at the place of production." Considering these provisions and, in connection therewith, the title and the general scope and purpose of the act, the intent to impose the tax only in respect of energy generated for barter, sale or exchange is sufficiently clear.

The limitation of the tax to electrical energy generated only for barter, sale or exchange obviously requires that in determining the amount so generated there be excluded from the computation all electrical energy generated for other purposes. In other words, the intent of the act being to levy a tax only in respect of electrical energy generated for the purposes named, it becomes necessary, in order to effectuate the intention, to deduct from the amount produced and measured at the generator such amounts as are generated for appellant's own use, or otherwise than for the specified purposes. We think this view is not precluded by the provision in § 1 of the act that the tax is levied in respect of the electrical energy generated, " measured at the place of production "; nor by the further provision in § 4 that the producer shall maintain at the point of production suitable appliances

190

for measuring the electrical energy produced. Since the tax applies not to all electrical energy generated, and, therefore, not to all measured at the point of production, but only to such as is produced for barter, sale or exchange, it necessarily follows that other factors than the basic measurement at the generator must be taken into consideration. That is, to put the matter concretely, the amount of the initial production must first be ascertained by measurement at the place of production, and from that there must be taken amounts used by the producer or consumed in effecting transmission (including so-called line or system losses), or disposed of otherwise than by barter, sale or exchange—the remainder only being subject to the tax. The record shows that the ascertainment of these necessary factors is practicable, testimony being to the effect that the flow of energy passing any point in the transmission system, as well as the amount delivered at any point on the system, can be measured with fair accuracy if proper instruments be attached. Neither the validity of the tax nor its certainty is affected because it may be necessary to ascertain, as an element in the computation, the amounts delivered in another jurisdiction. See *American Mfg. Co.* v. *St. Louis*, 250 U. S. 459, 463; *Hope Gas Co.* v. *Hall, supra.*

It is said that the commissioner, who administers the act, has not provided for these deductions or the means for determining them. But the commissioner must administer the act as it is construed, and it is not to be supposed that he will not now properly do so. Undoubtedly, the administration of an act like this one is attended with some difficulty. Measurements and calculations are more or less complicated. Absolute precision in either probably cannot be attained; but that is so to a greater or less degree in respect of most taxing laws. If, for example, absolute exactness of determination in respect of net income, deductions, valuation, losses, obsolescence,

depreciation, etc., were required in cases arising under the federal income tax law, it is safe to say that the revenue from that source would be much curtailed. The law, which is said not to require impossibilities, must be satisfied, in many of its applications, with fair and reasonable approximations. Compare *Smith* v. *Illinois Bell Tel. Co.*, 282 U. S. 133, 150; *Story Parchment Co.* v. *Paterson Co.*, 282 U. S. 555, 563–566; *Commonwealth* v. *People's Five Cents Savings Bank*, 87 Mass. 428, 436.

<div align="right">

*Decree affirmed.*