**ARKANSAS–LOUISIANA PIPE LINE CO.
v. COVERDALE, Sheriff and Tax
Collector.**

**No. 615.**

District Court, W. D. Louisiana, Monroe
Division.

May 24, 1937.

See, also, 17 F.Supp. 34.

Blanchard, Goldstein, Walker & O'Quin,
of Sheveport, La., for complainants.

A. L. Davenport, and J. B. Dawkins,
both of Monroe, La., Gaston L. Porterie,
Atty. Gen., and J. C. Daspit, Fred A.

Blanche, and E. L. Richardson, all of Baton Rouge, La., for respondents.

Before FOSTER, Circuit Judge, and DAWKINS and BORAH, District Judges.

DAWKINS, District Judge.

The issues in this case have been stated in opinions heretofore handed down on the application for preliminary injunction.

On the original hearing a preliminary writ was granted on the finding that the statute assailed violated provisions of both the State and Federal Constitutions. Shortly thereafter, the State Supreme Court (181 La. 117, 158 So. 640) sustained its constitutionality under the state law and a rehearing was promptly granted by this court. On the rehearing a preliminary injunction was issued for the reason we concluded the act in question infringed the commerce clause of the Federal Constitution (article 1, § 8, cl. 3). The case has now been submitted on the merits.

The evidence before us is the same, except that respondent has offered additional affidavits to show the mechanical operation of the compressor station and its accessories, together with expert opinions of the witnesses as to the effects. The purpose was to sustain the contention of respondent that there is a distinct operation amounting to a manufacture of mechanical power before it is used to force the gas through the pipe lines and to thereby demonstrate that the case is parallel to that of Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038, in which a similar tax was sustained. The further contention is made by defendant from these facts that the gas does not enter the stream of interstate commerce until it passes through the condensers into the 20-inch pipe line through which it is conveyed to points of sale in the states of Texas and Arkansas. There is no dispute as to the physical or mechanical nature of these operations, and we find these additional facts as described by the witnesses without, however, accepting the conclusions or opinions which they advance as to effect.

■ As the name indicates, the plaintiff's business is one of transporting natural gas by pipe line, more than 96 per cent. of which is done in interstate commerce, as conclusively as if it operated tank cars in transporting the kindred mineral, crude oil, into the other states for sale. Naturally, gas not being susceptible of commercial transportation by the latter method, it has to be pumped through pipe lines. In conducting its business, plaintiff has the right to use as a part thereof all of the usual accessories and instrumentalities reasonably incident to its operation. See Norfolk & Western R. R. Co. v. Pennsylvania, 136 U. S. 114, 10 S.Ct. 958, 34 L.Ed. 394; Ozark Pipe Line v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439. It would seem, therefore, that it is entitled to use its compressor stations as a part of this business, free from improper state interference, equally with its pipe line. It was clearly held in State Tax Commission of Mississippi v. Interstate Natural Gas Company, 284 U.S. 41, 52 S.Ct. 62, 76 L.Ed. 156, that a similar excise tax could not be imposed based upon the size and mileage of the pipe line used in interstate commerce.

■ Does the plaintiff have any business or is it engaged commercially in doing anything other than transporting natural gas drawn from its own wells plus what it buys from others, 96 per cent. of which passes into and is sold in other states? If so, then under the doctrine of Utah Power & Light Co. v. Pfost, supra, that business or commercial operation we think may be taxed. The operation of its internal combustion engines is for the sole purpose of applying their power to the gas in drawing it from the wells through the gathering lines and forcing it through the main line to its destination outside of the state, just as the energy created by the burning of coal or oil in a locomotive furnishes the power to pull tank cars over a line of railroad. In the Utah Power Company Case it was shown that the taxpayer owned and operated a large power plant, in which, by applying the energy of falling water to a complete system of machines and accessories, a different valuable article of commerce was produced, to wit, electric power. It was this article or commodity so manufactured and produced which was conveyed over its lines. On the other hand, the plaintiff takes a natural product of the earth, and, except for passing it through machines for the elimination of refuse and impurities, by the same force, transports it from the wells into other states. The power produced or created by the mechanical operation of its internal combustion engines is exclusively for that purpose. None of it is sold or transported as such away from the point of its production. The distinction, we think, is made clear by the following ex-

pression of the Supreme Court in the cited case:

"We think, therefore, it is wholly inaccurate to say that appellant's entire system is purely a transferring device. On the contrary, the generator and the transmission lines perform different functions, with a result comparable, so far as the question here under consideration is concerned, to the manufacture of physical articles of trade and their subsequent shipment and transportation in commerce. Appellant's chief engineer, although testifying that generation is a part of the process of transferring energy, said on cross-examination that in the process of generation there is a 'conversion of the mechanical energy in the turbine shaft into a different form of energy, that is electrical energy. It must be converted into electrical energy before it can be transmitted. * * * This process of transformation is complete at the generator, and you have a greater amount of energy there, capable of doing a greater amount of mechanical work, at the generator than you do after transmitting it into Utah.' The evidence amply sustains the conclusion that this transformation must take place as a prerequisite to the use of the electrical product, and that the process of transferring, as distinguished from that of producing, the electrical energy, begins not at the water fall, but definitely at the generator, at which point measuring appliances can be placed and the quantum of electrical energy ascertained with practical accuracy." Utah Power & Light Co. v. Pfost, 286 U.S. 180, 52 S.Ct. 548, 552, 76 L.Ed. 1038.

Our conclusion is that the attempted assimilation is metaphysical and that the business or operation cannot be dissected or torn apart so as to make of it distinct entities for the purpose of taxation, but that it must be treated as a unit and that entire unit is engaged almost exclusively in interstate commerce.

Passing now to the alternative contention of respondent, i. e., that, notwithstanding the engines may be instrumentalities of interstate commerce, they may nevertheless be taxed as here undertaken. It is well settled that a state may levy taxes which indirectly affect such commerce, such as ad valorem taxes upon the physical property situated therein, franchise taxes, occupational or license taxes, and on the net profits of a business part of which was derived from interstate commerce.

Property physically in and having its situs within the state receives the same benefits of protection from its laws, whether used in one class of commerce or the other, and may be taxed accordingly where there is no discrimination. In similar fashion, a corporation doing business within the state and for the same reasons may be required to pay franchise taxes. So, too, may corporations or individuals, engaged in interstate commerce, be taxed for the privilege of carrying on their business or pursuing their occupations where they have a domicile or business situs in the state. However, all of these are indirect taxes, since they do not bear immediately upon the commerce itself or the instrumentalities by which it is carried on. On the other hand, wherever and whenever a tax has been laid upon objects or articles passing in interstate commerce, or the instrumentalities or agencies by which it is carried on, the same has been held beyond state power under the commerce clause of the Federal Constitution. See cases cited and discussed in Helson & Randolph v. Kentucky, 279 U. S. 245, 49 S.Ct. 279, 73 L.Ed. 683. This case cites and quotes with approval from that of Minot v. Philadelphia, Western & B. R. R. Co., 17 Fed.Cas. page 458, 459, No. 9,645, in which the state of Delaware had imposed an excise or privilege tax requiring that "every railroad incorporated by the state, and doing business therein, should, on the first day of January in each year thereafter, within thirty days from such time, pay to the state treasurer a tax of one hundred dollars, for the use, in the said state of Delaware, of each locomotive belonging in whole or in part to such company, and at any time during the preceding year used by said company within the state of Delaware," $25 for each passenger car, and $10 for each freight car or truck used under the same circumstances. Mr. Justice Strong, sitting on circuit, in sustaining the plea of unconstitutionality under the commerce clause, among other things, had this to say:

"The remaining question is attended with more difficulty. I refer to the legality of the tax imposed by section 3 of the act. That section exacts from the company the payment every year of a tax of one hundred dollars for the use in the state of each locomotive, owned in whole or in part by the company, and at any time during the preceding year used by the company, within the state. A similar tax, though less in amount, is imposed for the use in the state

of each passenger, freight, and truck car; for the use of the rolling stock generally. This is not a tax upon the property of the company, nor upon its franchise generally. It is not a tax upon the locomotives or the cars. It is called a tax upon their use in the state; but it seems to be rather a license fee exacted for the privilege of using rolling stock. Can such a burden be imposed? I have said the franchise can be taxed as property, and that the property acquired or held under it is taxable; but it may be doubted whether such an exaction as this can be regarded as a tax either on the franchise or on the property of the company. Can the state, after having granted to the complainants the right to run locomotives in and through its territory freely, and also the right to use all the ordinary means of conveying freight and passengers, compel the payment of license fees for the use of those ordinary means of transportation, and that not for police purposes? Can it say to the grantees of this franchise, 'True, you have purchased the right to use locomotives and cars; but if you use them you shall pay an additional price'? And is not a license fee thus exacted an additional price? I do not propose, however, to answer these questions or to decide that such an exaction is or is not an impairing of the obligation of the contract between the company and the state, for, in my opinion, the law of the state that attempts to impose this tax or duty is invalid for other reasons.

"In the statement of facts to which the parties have agreed, I find the following. It is agreed 'that much the larger portion of the locomotive engines, passenger cars, freight cars, and trucks, belonging to the Philadelphia, Wilmington, & Baltimore Railroad Company, were used during the year 1869 (the year for which this tax is attempted to be collected), on the aforesaid main line of railroad of the said company, extending from the city of Philadelphia, in the state of Pennsylvania, through the state of Delaware to the city of Baltimore, in the state of Maryland, and for the purpose of transporting persons and property in and by a continuous course of transportation through, from, and into the said state of Delaware; that a number of engines, passenger and freight cars, and trucks, were used during the said year, on the main line from Philadelphia to a point about a mile beyond Wilmington, and thence on the line of railroad known as the "Peninsular Line," extending through Delaware and a part of the eastern shore of Maryland to Christfield, and the several branches therefrom, and that very few of either the engines, cars, or trucks, of the said company, were used exclusively within the state of Delaware during the year 1869.'

"It is, therefore, admitted, that the tax or license fee is laid upon the use of the locomotives, cars, etc., mainly employed in transporting persons or property through the state from other states, or into it, or out of it. Such an imposition is, in my opinion, a regulation of commerce between states. It is a prescription that passengers and merchandise shall not be carried through the state except upon certain conditions. If the tax can be imposed at all, it may be to any extent. It has often been said that when a right to tax exists it is unlimited by anything but the discretion of the legislature that imposes it. This, of course, is to be understood as applying only to cases where the state has not by contract restricted its power. Said Chief Justice Marshall, in McCullough v. Maryland, 4 Wheat. (17 U.S.) 316 [4 L.Ed. 579]. 'An unlimited power to tax involves necessarily a power to destroy, because there is a limit beyond which no institution and no property can bear taxation. A question of constitutional power can hardly be made to depend on a question of more or less. If the states may tax, they have no limit but their discretion, and the bank must, therefore, depend on the discretion of the state for its existence.' If this is so, the power to tax the use of all means or instruments of conveyance of persons or property through the state is the same as a power to prevent such use entirely. There is only a difference in the extent of its exercise. * * * I need hardly say, that a tax upon the ordinary and lawful means of transportation is practically a tax upon the thing transported. * * * Surely passage and transportation through a state are of this nature. If not, it is unfortunate. It is of national importance that in regard to such subjects there should be but one regulating power, for if one state can directly tax persons and property passing through it, or indirectly, by taxing the use of means of transportation, every other may; thus commercial intercourse between states remote from each other may be destroyed. The produce of Western states may be effectually excluded from Eastern

markets; for though it might bear the imposition of a tax by one state, it would be crushed under the weight of many."

 If the respondent in this case can impose a tax based upon the horse power of the engines used in propelling the gas from one state to another, there is no limit upon its amount except legislative discretion, so long as there is no discrimination. Many pipe lines, as illustrated by the one from the gas fields in the Panhandle of Texas to Chicago, pass through several states and the transportation of the gas is made possible by the use of these compressor stations. If the state where the commodity or shipment originates can impose such a burden upon those instrumentalities, we can see no logical reason why the other states, through which the gas passes en route to its destination, and in which it may be necessary to construct similar pumping or "booster" stations, may not impose similar taxes in their discretion. So that, by the time the gas reaches its destination, the cost to the consumer could be prohibitive. As the supply of natural gas in the country becomes exhausted, the desire of states in which it is produced to save it for use by its own citizens may tempt them to resort to appropriate expedients to prevent its being taken beyond their borders. That this will be attempted has already been demonstrated by the unsuccessful effort of West Virginia, in the case of Com. of Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, 32 A.L.R. 300. Should it be held that an excise tax may be validly laid upon the production of power used in such transportation, then the door is open to such abuse. We are compelled to say that the tax in this case is a direct burden upon the interstate commerce of the plaintiff, and hence the section of the statute in question is contrary to the commerce clause of the Federal Constitution, in so far as it applies to plaintiff's business.

 Since our decision on the application for preliminary injunction, the Supreme Court has handed down a number of opinions which we think clarify considerably, if they do not enlarge, the meaning of interstate commerce in its relation to business activities extending into more than one state. In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, decided on April 12, 1937, the Act of July 5, 1935 (49 Stat. 449, 29 U.S.C. § 151 et seq. [29 U.S.C.A. § 151 et seq.]), was upheld in so far as it applied to workers in the steel mills of the defendant. It is held that the business of defendant extending into many states was such that provisions of the act of Congress in question, regulating the relations between employer and employee in interstate commerce, were applicable to employees of the appellant, although the work performed involved to some extent processes of manufacture. The Stockyards (Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229) and Grain Futures (Minnesota v. Blasius, 290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131) cases were cited as analogous, in that the products (ores and steel) of Jones & Laughlin, upon which labor was performed, were in effect in continuous passage from one state to another. In the present case the journey is actually continuous, although, as is elsewhere stated herein, the gas passes through machines which extract refuse and other nonmerchantable substances, as well as gasoline required by the state law. If the employees of the plaintiff in the present case, who operate the compressor stations, in the light of these latest decisions of the Supreme Court, can be said to perform their work in interstate commerce so as to be subject to the provisions of the Wagner-Connery Labor Relations Act (29 U.S.C.A. § 151 et seq.), as to which there appears little room for doubt, then those instrumentalities actually used in propelling the gas through the main pipe lines into other states would appear to be such a necessary and indispensable part of the plaintiff's business as to make a tax upon their use a direct burden upon interstate commerce. See, also, Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953; National Labor Relations Board v. Fruehauf Trailer Company, 301 U.S. 49, 57 S.Ct. 642, 81 L.Ed. 918, 108 A.L.R. 1352; Washington, Virginia & Maryland Coach Company v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; and, National Labor Relations Board v. Friedman-Harry Marks Clothing Company, Inc., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352, decided at the same sitting.

The writ of injunction should, therefore, be made permanent.