GROSS INCOME TAX DIVISION, DEPARTMENT OF STATE REVENUE, STATE OF INDIANA *v.* CHICAGO DISTRICT ELECTRIC GENERATING CORPORATION.

[No. 29,227.   Filed December 20, 1956.]

*Edwin K. Steers,* Attorney General, *Carl M. Franceschini, Lloyd C. Hutchinson, George F. Hall,* and *Charles D. Rodgers,* Deputy Attorneys General, for appellant.

*McHale, Patrick, Cook & Welch,* of Indianapolis, for appellee.

BOBBITT, J.—This appeal was commenced by appellee pursuant to the provisions of Acts 1947, ch. 370, §3, p. 1471, being §64-2614, Burns' 1951 Replacement, for the recovery of gross income and bonus taxes paid under protest for the years of 1947 through 1952,[1] inclusive, and for the recovery of interest at the rate of 3 per cent per annum on the amount alleged to have been improperly charged and collected. From a judgment for plaintiff-appellee this appeal is prosecuted.

Appellee asserts that the imposition of the tax upon its income here in question violates Article 1, Section 8, Clause 3 of the Constitution of the United States; the Fourteenth Amendment thereto, and Section 6(a) of the Indiana Gross Income Tax Act, as amended (Acts

1. By a notice of proposed assessment against appellee issued on November 18, 1937, the appellant's predecessor, the Department of Treasury of the State of Indiana, raised this same question with respect to the years 1933 through 1936, inclusive. Upon appellee's protest and after presentation of evidence and a hearing, the Department of Treasury in its ruling of January 19, 1940, held in favor of appellee and against the taxability under the Gross Income Tax Act of receipts identical to those involved in this case.

On December 26, 1945, appellant again issued a notice of proposed assessment involving sales identical to those involved in the earlier proposed assessment and in this case by appellee to Commonwealth Edison for the years 1942 through 1944, inclusive. Again, after protest by appellee, the submission of evidence and a hearing thereon, appellant's administrative ruling on April 23, 1947, denied the taxability under the Gross Income Tax Act of proceeds of such sales.

The same issue was raised for the third time by appellant's notice of proposed assessment of February 7, 1950, affecting appellee's sales to Commonwealth Edison during 1947 and 1948. Again, appellee protested this proposed assessment but after submission of evidence and hearing thereon, appellant on September 11, 1952, denied the protest and started in motion the series of events which culminated in this law suit.

While the various rulings of the Department are not decisive of the question now before us, it is of interest to note that during fourteen out of nineteen years the Department ruled that appellee's income was not subject to the Indiana Gross Income tax.

1955, ch. 291, §1(a), p. 833, being §64-2606(a), Burns' 1951 Repl. (1955 Cum. Supp.)), because such income was derived from the sale of electrical energy in interstate commerce, and that the imposition of the Indiana Gross Income Tax thereon is an invalid burden upon such commerce.

Appellant denies these assertions and contends that the income producing activities herein are completed wholly within the State of Indiana and are purely local activities which are subject to Acts 1955, ch. 260, §1(e), p. 682, being §64-2603(e), Burns' 1951 Repl. (1955 Cum. Supp.), which provides, in pertinent parts, as follows:

"With respect to that part of the gross income of every person received from producing, transmitting, furnishing, wholesaling, and/or retailing electrical energy; . . . the tax shall be equal to one per cent [1%] of such part of the gross income."

Plaintiff-appellee is a corporation engaged exclusively in the production, transmission and sale of electrical energy. Its only plant is located on the shore of Lake Michigan at the north edge of the City of Hammond, Indiana, and is devoted exclusively to such purposes. The western line of plaintiff-appellee's property on which said plant is located abuts the boundary line between the States of Indiana and Illinois.

Appellee has only two customers, Northern Indiana Public Service Company, an Indiana Corporation, whose principal office is located at Hammond, Indiana, and Commonwealth Edison Company, an Illinois corporation, whose principal office is located at Chicago, Illinois. The sale of electrical energy by appellee to Northern Indiana Public Service Company is not involved in this case.

The electrical energy with which we are here concerned is generated at appellee's plant within Indiana

and, upon demand therefor by Commonwealth Edison Company, is transmitted from such plant within Indiana across the Illinois State line to three transmission terminals of Commonwealth Edison Company, all located within the State of Illinois, at which transmission terminals the energy so received by Commonwealth Edison Company from the appellee is commingled with other energy, and is either reduced in voltage for distribution or transmitted to other terminals. There is no interruption in the transmission lines or in the flow of such energy between the point within the appellee's plant in Indiana at which such transmission commences and the transmission terminals of Commonwealth Edison Company located in the State of Illinois.

The agreement under which electrical energy is supplied to Commonwealth Edison Company is a lengthy document, most of which is not pertinent to the question here under consideration, and we think to set it out here would serve no purpose except to unduly extend this opinion.

A careful examination of the entire agreement between appellee herein and Commonwealth Edison Company leads to the definite conclusion that it is essentially and simply a contract for the sale and purchase of electrical energy which appellee has produced, and is to produce, in the State of Indiana, for sale and transmission to Commonwealth Edison in the State of Illinois. Article II, §7 of the agreement which provides, in part, as follows: "The energy supplied hereunder shall be in the form of three-phase alternating current . . . Edison shall take delivery of such energy at the property line of State Line Station.", (the Illinois State line) ; and Article III, which provides for the measuring of kilowatts and kilowatt-hours furnished under the agreement, are only a few of its provisions which effectively support this conclusion.

While not binding upon this court, nevertheless, the fact that the Federal Power Commission Docket No. IT-5500, in an order entered July 16, 1941, found that, "Respondent [appellee herein] is engaged in the business of transmitting and selling at wholesale electric energy in interstate commerce within the meaning of Section 201 of the Federal Power Act; it transmits and sells at wholesale in interstate commerce to EDISON for resale to consumers in the City of Chicago, Illinois, under present arrangements, approximately 80 per cent of the electric energy which it generates; . . . ," has some persuasive effect in determining the nature of the agreement here before us.

As was the case in *Utah Power & Light Co.* v. *Pfost* (1932), 286 U. S. 165, 76 L. Ed. 1038, 52 S. Ct. 548, appellee herein is engaged in two activities. Insofar as it produces and generates electrical energy in Indiana its business is intrastate and a purely local activity, subject to State taxation and control. In transmitting electrical energy across the State line into Illinois, appellee is engaged in interstate commerce.

The transmission of electrical energy by appellee to its State Line Station is solely for interstate sale and transmission and the current, at that time, is not only actually committed to, but is moving in, interstate commerce. The generation and transmission of electrical energy is a continuous and simultaneous operation, and where the transmission for use of the electrical energy is made to points within a State different from the State in which it is generated and produced, such a transaction is made in interstate commerce. Hence, it follows that the transmission and sale of electrical energy by appellee across the Indiana State line into the State of Illinois constitutes transactions in interstate commerce; *Panhandle Eastern Pipe Line Co.* v. *Calvert* (1954), 347 U. S. 157, 98 L. Ed. 583, 74 S.

Ct. 396; *Utah Power & Light Co.* v. *Pfost, supra;* and the gross receipts therefrom are not taxable under the Indiana Gross Income Tax Act.

A tax on gross income from transactions in interstate commerce is an unconstitutional burden upon, or interference with, commerce among the States as prohibited by Article 1, Section 8 of the Constitution of the United States. *Gross Income Tax Div.* v. *Surface Comb. Corp.* (1953), 232 Ind. 100, 143, 111 N. E. 2d 50, (Cert. denied, 346 U. S. 829, 830, 98 L. Ed. 353, 74 S. Ct. 51); *Gross Income Tax Div.* v. *L. S. Ayres & Co.* (1954), 233 Ind. 194, 118 N. E. 2d 480; *J. D. Adams Mfg. Co.* v. *Storen* (1938), 304 U. S. 307, 82 L. Ed. 1365, 58 S. Ct. 913, 117 A. L. R. 429; *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274.

The tax which the State of Indiana seeks to impose upon appellee herein is not a license tax upon the manufacture, generation or production of electricity within the State as was the situation in *Utah Power & Light Co.* v. *Pfost* (1932), 286 U. S. 165, 76 L. Ed. 1038, 52 S. Ct. 548, *supra;* nor is it an excise, license, or privilege tax on the production and sale of electric power within the State as was the case in *South Carolina Power Co.* v. *South Carolina Tax Commission* (1931), 52 F. 2d 515 (affirmed, 286 U. S. 525, 76 L. Ed. 1268, 52 S. Ct. 494), but rather is a tax upon the gross receipts from the sale of electrical energy.

The tax imposed by Acts 1955, ch. 260, §1(e), p. 682, being §64-2603(e), Burns' 1951 Repl. (1955 Cum. Supp.), is levied upon the gross income received from "producing, transmitting, furnishing, wholesaling, and/or retailing electrical energy; . . . .", and is not based upon the purely local activity of producing or generating the same; nor is it a tax or license fee for the privilege of engaging in any of such activities.

In the case at bar the State seeks to impose a tax not on the gross income received from producing, transmitting, furnishing, wholesaling and/or retailing electrical energy within the State of Indiana, but rather upon the gross receipts from its sale and transmission in interstate commerce. Such an act not only violates Acts 1955, ch. 291, §1(a), p. 833, being §64-2606(a), Burns' 1951 Repl. (1955 Cum. Supp.), *supra*, of the Gross Income Tax Act, but also Article 1, Section 8 of the Constitution of the United States.

The appellee has filed an assignment of cross-errors. However, since the judgment of the trial court must be affirmed on the issues presented by appellant's assignment of error, it is not necessary to consider the questions raised by the cross-errors.

The judgment of the trial court is affirmed.

Emmert and Landis, JJ., concur.

Achor, C. J., dissents with opinion.

Arterburn, J., dissents with opinion.

### Dissenting Opinion

ACHOR, C. J.—I dissent in this case for the following reasons: The majority opinion initially describes the "Plaintiff-appellee (as) is a corporation engaged exclusively in the production, transmission and sale of electrical energy." If it is a fact that appellee is engaged in the *sale* and transmission of electrical energy to Edison (an Illinois corporation), then the receipts from such sale are not subject to tax, and the majority opinion is correct. However, it is upon this basic premise that I am in disagreement with the majority of the court.

In my opinion the appellee and Edison are not engaged in the *sale* and *purchase* of electrical energy. Theirs is a distinct and different type of contractual

relationship by which, with skillful craftsmanship and meticulous care, the contracting parties avoided the vendor-vendee relationship and, with purpose and design, entered into a contract whereby in minute detail Edison engaged appellee's *facilities* and contracted to pay all *expenses for the production* and the delivery of its own electricity. True, the contract provided that the energy accepted by appellee be measured as to kilowatt hours but such measurement was for the purpose of prorating the "actual cost of the coal" consumed in the manufacture of the current delivered to Edison. Payment was not made for the electricity itself. Thus it is my firm conviction that the payment which appellee received was for the *production* of electricity which was wholly within the State of Indiana. Therefore, there is no legitimate reason why appellee, which enjoys all the services of our state government, should not bear its just share of the cost of such government by paying the tax here imposed.

The problem with which we are here concerned is contractual. At the outset our attention is called to the fact that the transaction between the appellee and Edison has previously been ruled upon by the Federal Power Commission in its order of July 16, 1941, which is hereafter referred to. In that order the Federal Power Commission found that "the electrical energy supplied Edison is generated in Indiana and transmitted to the Illinois-Indiana state line at which point it is delivered and sold to Edison." However, appellee is quick to admit that this ruling is not binding upon this court but suggests that it should be persuasive of our decision in this case. To what extent is the order of the Federal Power Commission persuasive of the issue in this case? The Federal Power Act in §201(b) and (c) thereof (Title 16 U. S. C. A., §824(b) and (c)), provides as follows:

"(c)   For the purpose of sections 824-824h of this title, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; . . ."

Under the broad powers of the foregoing statute the Federal Power Commission had jurisdiction over appellee, regardless of the capacity in which appellee produced the electrical energy since the current was transmitted by appellee into another state for consumption. Under this statute it is not material whether or not there was a sale of the electrical energy so transmitted.

The fact that a transaction may, for regulatory purposes, be under the jurisdiction of a Federal agency does not deprive a state the power to tax that part of such transaction which may be entirely local or occurs entirely within the boundaries of the taxing state. *South Carolina Power Company* v. *South Carolina Tax Commission* (1931), 52 F. 2d 515, affirmed 1930, 286 U. S. 525; *Albuquerque Broadcasting Co.* v. *Bureau of Revenue* (1955), 59 N. M. 201, 281 P. 2d 654, 350 U. S. 806, 100 L. Ed. (advance), p. 47, No. 217, appeal dismissed for want of a substantial Federal question.

As heretofore stated, the problem with which we are here concerned is contractual and, even though the contract is lengthy, there is no method whereby it can be construed without considering its essential provision and the evidence relative thereto.

The contract entered into by appellee with Commonwealth Edison Company of Illinois and other evidence which has a bearing on the question are, as follows: Appellee is a corporation, organized and existing under the laws of Indiana, and, as such, owns and operates an electrical generating plant located at the extreme northwest corner of the State of Indiana. The western

boundary line of its property is the boundary line between the states of Indiana and Illinois. Appellee was organized in 1926 for the purpose of generating, transmitting and selling electric energy. At the time it started business operations the stock of appellee was owned by four corporations, Commonwealth Edison Company, Public Service Company of Illinois, both Illinois corporations, Interstate Public Service Company of Indiana, and Northern Indiana Public Service Company, the latter two being Indiana corporations. The contracts provided that the above companies, allocated generating capacity from appellee's plant, were to pay appellee their respective shares of appellee's fixed charges based on appellee's invested capital in plant facilities. Each company's share was the proportionate part of the total net generating capacity which appellee's generating company assigned to the production of energy for each of the receiving companies. In addition to the payment of proportionate shares of such fixed charges, each of said companies agreed to pay to the appellee its proportionate part of appellee's operating expenses. Such operating expenses so apportioned included (1) management and general expenses; (2) operating labor expenses; (3) expenses of operating supplies, excluding fuel; (4) expenses of maintenance and repairs, including labor and materials; (5) reasonable charges on account of employee's benefits, including proportionate charges for service entities and savings funds, and (6) a fuel charge representing the cost of fuel consumed in the generating operation.

On January 1, 1939 new agreements were made, under which Edison and Northern Indiana Public Service Company, hereinafter referred to as NIPSCO, contracted for the entire generating capacity of appellee's plant. *Edison* at that time acquired and *now owns 100 per cent of the voting stock of appellee.* Other changes

in the agreements were made July 1, 1939, and the two agreements were made effective as of January 1, 1939.

During this period the Federal Power Commission instituted an investigation into the contracts and operations between appellee and Edison and NIPSCO. As a result of such hearing, the Federal Power Commission issued an order in July, 1941 for appellee to reduce its capital investment base, and to reduce the rate of return on said capital investment base from 11½ to 5½ per cent. Pursuant to the order of the Federal Power Commission, appellee entered into a contract with Edison and NIPSCO, effective as of July 1, 1941. This is the contract now in force and the subject of this litigation. As heretofore stated, the express purpose of this contract was "to readjust the basis under which Edison shall hereafter . . . obtain *generating capacity* in the State Line Station." This contract provides that appellee allocate to Edison 252,000 kilowatts of the total net capacity of appellee's generating facilities which aggregated 342,000 kilowatts. (The other 90,000 kilowatts of the total net capacity was allocated to NIPSO.) With regard to payment for such "generating capacity" this contract provides, among other things, that Edison shall pay to appellee each month—*not for electricity sold and transmitted,* but the following *charges*:

1. *A general investment charge* equal to 1/12 of 5½ per cent of Edison's proportionate (252/342) part of appellee's (a) net general investment, and (b) working capital and investment and (c) investment in special facilities (transformers, etc.), which were used exclusively for Edison's benefit.

2. *A general depreciation charge* of 3 per cent, (a) based on Edison's proportionate part of appellee's investment in special facilities used solely by Edison.

3. Edison's proportionate share of *appellee's general*

*tax charge* and the full tax charge of special facilities used exclusively for Edison's benefit.

4. Edison's proportionate part, plus *the full expense of operating special facilities* used exclusively for Edison's benefit.

5. Edison's proportionate part of *a general fuel charge* defined and calculated as follows:

"(a) There shall first be determined for such month the actual cost of fuel burned at State Line Station (appellee). Such actual cost of fuel burned shall include all expenses relating to the fuel required to produce the steam utilized for the production of energy, properly chargeable to fuel in accordance with the classification of account prescribed for Chicago District. It shall also include the net cost of, or there shall be deducted therefrom, the net amount realized from the disposal of ashes.

(b) The actual cost for such month of fuel burned at State Line Station shall be divided by the total number of kilowatthours of net output of State Line Station during such month. The quotient shall be the State Line fuel charge for such month.

(c) Edison's general fuel charge for such month shall be the net total number of kilowatthours supplied by Chicago District (appellee) to Edison in such month from Edison's allotted and surplus capacity multiplied by such State Line fuel charge for such month."

6. *Revenue tax charges,* if any, payable for *"gross revenue,* sales, or other similar taxes directly applicable to the charges . . . payable under this agreement."

7. The contract further provided that, in event Edison failed to pay any bill rendered under the agreement within 15 days, appellee had the right to discontinue supplying energy after giving Edison 30 days' notice, in writing, and the discontinuance of the energy would not discharge Edison from making *monthly payments* of all the charges provided for in the agreement, *just the same as if Edison had received the electrical energy.*

Under "the terms and conditions of this agreement," was there a "sale" of electric energy as a product from appellee to Edison? Was there "a transfer of property for a price" or does Edison pay appellee for the *generating capacity* and other expenses incident to the *production* of the electric energy which, admittedly, it received from appellee's plant?

From this contract and the evidence before us, I am of the opinion that, although Edison receives electric energy from appellee, it does not pay for electric energy itself. Rather, it pays for *generating capacity* within appellee's plant and for the *production* of energy by that plant, which production was exclusively within the State of Indiana. Therefore, the sum paid appellee by Edison is subject to tax under §64-2603(e), Burns' 1951 Repl. (1955 Supp.).

A more simplified analogy would be presented by a circumstance where A owned a hand generator and B and C contracted with A for A to use and crank the machine and thereby generate current for them, the agreement being that A would allocate the entire generating capacity of his machine equally between B and C, and that each would pay A an equal fixed rental for the use of the machine. That B and C would pay A wages for the energy he expended (comparable to "the actual cost of coal") in the proportion that they actually received current from him. Under these circumstances, B and C were not buying electric current from A at a price per kilowatt-hour. A was an employee of B and C. They were paying him for *generating capacity* and the *production* of electric energy.

A comparable situation existed in the case of *Utah Power & Light Co.* v. *Pfost* (1932), 286 U. S. 165, 181, 182. That case involved the levy of a license tax upon the manufacture, generation or production of electricity within the State of Idaho. The Utah Power & Light

Company owned a hydro-electric plant upon which the license tax was applied. The plant was connected by interstate transmission lines with distribution facilities situated outside the state. Injunction proceedings were instituted to restrain the collection of the tax on the ground that the generation and transmission of energy was a continuous operation in interstate commerce; that the generator was an instrumentality of interstate commerce and that, therefore, the tax was a burden upon that commerce. The court, however, supported the validity of the tax and said, on pages 181 and 182:

> "We are satisfied, upon a consideration of the whole case, that the process of generation is as essentially local as though electrical energy were a physical thing; and to that situation we must apply, as controlling, the general rule that commerce does not begin until manufacture is finished, and hence the commerce clause of the Constitution does not prevent the state from exercising exclusive control of the manufacture. . . .
>
> "Without regard to the apparent continuity of the movement, appellant, in effect, is engaged in two activities, not in one only. So far as it produced electrical energy in Idaho, *its* business is purely intrastate, subject to state taxation and control."

In my opinion, therefore, the decision of the trial court was contrary to law and should be reversed.

### DISSENTING OPINION

ARTERBURN, J.—The primary issue here is the right of the state to exercise its taxing power, and whether we should take a stand against further federal encroachment upon state sovereignty. We owe it to the sovereign state of Indiana, its taxpayers, and citizens to take a stand where our convictions are sincere.

Stripped of many confusing and unimportant de-

tails in this case, the right of the State of Indiana to exercise its taxing power turns on the point of whether or not the 1% state gross income tax imposed upon the income received by a utility for generating and delivering electrical energy in this case *is a burden* on interstate commerce, and thereby encroaches upon an area of federal jurisdiction. We believe that the manufacturing of electrical energy done entirely in Indiana is not part of interstate commerce, and is not a sale in interstate commerce. In this case, the transmission of the electrical energy to a recipient at a state line after its manufacture, but a few feet from the same state line, is such an infinitesimal part of the whole transaction, that to say that feature characterizes the whole transaction as interstate commerce, and thus exempts it from the state tax, is to make the tail wag the dog. The gross income was paid, and received *primarily for the manufacturing and production process*. Since this took place entirely in the State of Indiana, a gross income tax thereon should be paid by such manufacturer the same as any other manufacturer in Indiana. *Indiana Farmers Guide Pub. Co.* v. *Dept. of Treas.* (1940), 217 Ind. 627, 29 N. E. 2d 781; *International H. Co.* v. *Dept. of Treasury* (1944), 322 U. S. 340, 88 L. Ed. 1313, 64 S. Ct. 1019, 1030; *Dept. of Treasury* v. *International Harvester Co.* (1943), 221 Ind. 416, 47 N. E. 2d 150.

However, even if we assume that this is a transaction in interstate commerce, still, before the tax is prohibited by the Constitution it must be shown to be a *burden to the extent that it interferes with such commerce*. The facts here belie the argument. The appellee corporation generates and furnishes electrical power to Indiana consumers through the Northern Indiana Public Service Company, and also to consumers across the state line in Illinois through the Commonwealth

Edison Company. As a result of the majority opinion in this case, the Illinois utility and its customers will receive electrical energy manufactured in Indiana free of the tax while the Indiana utility and its customers just across the state line will have to pay the tax. In fact, the exemption of the Illinois Corporation and its customers from the tax gives them a competitive advantage over Indiana consumers of electrical energy coming from the same source. *Such a result, instead of eliminating a so-called burden on interstate commerce, creates an inequality and, if anything, it adds a burden, which undeniably affects interstate commerce.*

We recognize the United States Supreme Court has said that manufacture and transmission is a "seamless webb." Such fine words many times are used to avoid more exact thinking. We further know how sensitive that court seems to be to any burden, real or apparent, on interstate commerce. *Freeman* v. *Hewit* (1947), 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274; *United Fuel Gas Co.* v. *Hallanan* (1921), 257 U. S. 277, 66 L. Ed. 234, 42 S. Ct. 105; *Michigan-Wisconsin P. L. Co.* v. *Calvert* (1954), 347 U. S. 157, 98 L. Ed. 583, 74 S. Ct. 396.

On the other hand, we find this same court views with little concern the encroachment and burdens of federal taxation which are placed on the state's sovereign functions. A federal income tax which taxes all salaries and wages paid by a state government and its instrumentalities beginning at not less than 18% is not considered a burden on the functioning of state government by that court. The state payroll has thereby been increased by not less than 18%. The tax burden of the state could be reduced accordingly were it not for this imposition by the Federal government. Neither is the expense and task of making the deductions from such salaries, the bookkeeping, and remittance of funds

in connection therewith, admitted to be any burden imposed by the Federal government on the state. This process has continued to the degree where a sovereign state is made a tax collecting agency for the Federal government under the fiction that taxes and the collection thereof is no burden. *Helvering* v. *Gerhardt* (1938), 304 U. S. 405, 82 L. Ed. 1427, 58 S. Ct. 969; *Graves* v. *New York* (1939), 306 U. S. 466, 83 L. Ed. 927, 59 S. Ct. 595, 120 A. L. R. 1466.

Salaries paid by a state or its instrumentalities are not exempt from federal taxes, yet Congress may exempt federal salaries from state taxes under some type of twisted reasoning that one tax is not a burden on the state while the other is on the Federal government. 8 Ind. L. J. 476; 27 Am. Jur., Income Taxes, §§59, 60, pp. 343, 344.

The framers of the Constitution could never have conceived of such perversion of federal power in overriding the sovereignty of independent states. As another among many examples of how absurd this encroachment can become, the United States Supreme Court has held the Federal government may condemn, and take over property owned by a state or its instrumentalities. But, on the other hand, states may not take over federal property even though not used for a governmental function, but used only in a proprietary sense. *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.* (1941), 313 U. S. 508, 85 L. Ed. 1487, 61 S. Ct. 1050; *United States* v. *Carmack* (1947), 329 U. S. 230, 91 L. Ed. 209, 67 S. Ct. 252; *Utah Power & L. Co.* v. *United States* (1917), 243 U. S. 389, 61 L. Ed. 791, 37 S. Ct. 387; Note: 29 Ind. L. J. 206.

The reasoning of the United States Supreme Court is difficult to follow, and is practically impossible to predict. The overreaching of the Federal government

in the domain of state sovereignty has become so bizarre that I will not stultify myself in any attempt to follow the reasoning upon which it is based.

The "burden" created by the 1% state tax appears to us to be so insignificant and nebulous when compared with the burden of the federal income tax upon the states that it is not worthy of consideration. As long as the Federal government maintains that the assessment and collection of the federal income tax (of not less than 18%) on salaries paid by a state, and that the collection thereof imposed upon a state is no burden on state government, then I shall maintain a 1% gross income tax is no burden on interstate commerce. The citizens of Indiana are entitled to a fair and consistent interpretation of the Constitution without discrimination between the State and Federal government in the area of taxation. What is not an encroachment and burden for one is not an encroachment and burden for the other.

NOTE.—Reported in 139 N. E. 2d 161.