CALVERT, Comptroller, et al. v. PAN-HANDLE EASTERN PIPE LINE CO.

CALVERT, Comptroller, et al. v. MICHI-GAN–WISCONSIN PIPE LINE CO.

CALVERT, Comptroller, et al. v. AM-ARILLO OIL CO.

Nos. 10116–10118.

Court of Civil Appeals of Texas. Austin.

Feb. 4, 1953.

Rehearing Denied Feb. 25, 1953.

Price . Daniel, Atty. Gen. of Texas, Charles D. Mathews, First Asst. Atty. Gen., W. V. Geppert, C. K. Richards and E. Wayne Thode, Asst. Attys. Gen., for appellants.

Edward H. Lange, Kansas City, Mo., Vinson, Elkins & Weems, Gene M. Woodfin, all of Houston, Chas. I. Francis, Houston, Looney, Clark & Moorhead, by R. Dean Moorhead and Everett L. Looney, all of Austin, Culton, Morgan, Britain & White, by D. H. Culton, all of Amarillo, S. A. L. Morgan, Houston, Sidley, Austin, Burgess & Smith, all of Chicago, Ill., Wm. Lee Darrah, Amarillo, Adkins, Folley, Adkins, McConnell & Hankins by A. J. Folley, all of Amarillo, for appellees.

HUGHES, Justice.

These three causes in all of which Texas officials Robert S. Calvert, Comptroller of Public Accounts, Price Daniel, Attorney General and Jesse James, State Treasurer, are appellants and the Panhandle Eastern Pipe Line Company is appellee in Cause No. 10,116, the Michigan-Wisconsin Pipe Line Company is appellee in Cause No. 10,117 and the Amarillo Oil Company is appellee

in Cause No. 10,118,[1] were consolidated for trial below, were consolidated in this Court for hearing and argument and will all be disposed of by this opinion.

These suits were all brought under and in compliance with Art. 7057b, Vernon's Annotated Civil Statutes of Texas, authorizing and regulating institution of suits for the recovery of license and privilege taxes paid under protest.

Each appellee sought recovery of taxes paid under protest, such payments having been made in obedience to the provisions of Art. 7057f, Vernon's Annotated Civil Statutes of Texas.[2]

Trial below was nonjury and resulted in judgments for appellees for recovery of the sums for which they sued.

Findings of fact and conclusions of law were not requested of nor filed by the trial judge.

The single question presented for our decision is whether Article 7057f, a revenue statute, the pertinent portions of which are set out below,[3] as applied to the busi-

1. These appellees will be hereinafter referred to as Michigan-Wisconsin, Panhandle and Amarillo, respectively.

2. Sec. XXIII, H.B. 285, Chapter 402, page 740, Acts of 1951, 52nd Legislature of the State of Texas.

3. "Art. 7057f. Occupation tax on business of gathering gas. Definitions. Section 1. The provisions of Texas Revised Civil Statutes (1925) Articles 10, 11, 12, 14, 22, and 23 and Texas Laws 1947, Chapter 359, on the interpretation of Statutes shall apply specifically to this Section. In addition to these standard definitions, in this Section, unless the context otherwise requires:

"(a) 'Gas' means natural and casinghead gas or other gas taken from the earth or waters, regardless of whether produced from a gas well or from a well also productive of oil, distillate, condensate or other product.

"(b) 'Casing-head gas' means any gas or vapor indigenous to an oil stratum and produced from such stratum with oil.

"(c) 'Gathering gas' means the first taking or the first retaining of possession of gas produced in Texas for transmission whether through a pipe line, either common carrier or private, or otherwise after severance of such gas, and after the passage of such gas through any separator, drip, trap, meter or other method designed to separate the oil therefrom. In the case of gas containing gasoline or liquid hydrocarbons that are removed or extracted at a plant within the State by scrubbing, absorption, compression or any other process, the term 'gathering gas' means the first taking or the first retaining of possession of such gas for other processing or transmission whether through a pipe line, either common carrier or private, or otherwise after such gas has passed through the outlet of such plant.

"(d) 'Gatherer' means any person engaged in the gathering of gas.

"(e) 'Person' means and includes any person, firm, concern, receiver, trustee, executor, administrator, agent, institution, association, partnership, company, corporation, and persons acting under declarations of trust, as well as trustees acting under declarations of trusts.

"(f) 'Cubic foot of gas' or 'standard cubic foot of gas' shall have the definition ascribed thereto by Texas Laws, 1949, Chapter 519, Section 4, Texas Revised Civil Statutes (Vernon, 1948), Article 7047b, Section 2(12).

"Imposition of tax; amount; calculation

"Sec. 2. In addition to all other licenses and taxes levied and assessed in the State of Texas, there is hereby levied upon every person engaged in gathering gas produced in this State, an occupation tax for the privilege of engaging in such business, at the rate of $\%_0$ of one cent per thousand (1,000) cubic feet of gas gathered.

"In determining the quantity of the gas for the purposes of calculating such tax, there shall be excluded (a) gas produced and then lawfully injected into the earth of this State; (b) gas used for fuel in connection with lease or field operations; (c) gas lawfully vented or flared; and (d) gas used in the manufacturing of carbon black.

"Payment; penalty for delay

"Sec. 3. The tax levied hereby shall be paid by the gatherers on the 25th day of each month on all gas gathered in the State during the next preceding thirty (30) days prior to the first day of the month in which payment is required to be made. If such payment is not made within the time above prescribed, the amount due shall become delinquent and a penalty of ten percent (10%) of the amount of the tax shall be added and such tax and penalty shall bear interest

ness activities of appellees, violates the commerce clause of the Constitution of the United States.[4] If so it is void, if not it is valid.

Each appellee is engaged in the business of transporting natural gas by pipe line. There is no dispute as to the manner in which their business activities were conducted. These matters were stipulated. Since Michigan-Wisconsin presents the strongest factual position favorable to appellees we will fully describe it and its activities first.

Michigan-Wisconsin is a natural gas company as defined in the Federal Natural Gas Act, 15 U.S.C.A. § 717 et seq., and holds certificates of convenience and necessity issued by the Federal Power Commission. Such certificates authorize it to engage in interstate transportation and sale of natural gas. It has constructed a pipe line which originates at a point in Hansford County, Texas, and which terminates at various points in the States of Michigan and Wisconsin. At these points, and at other points in the States of Missouri and Iowa, it sells natural gas to distribution companies which serve markets in those areas. It sells no gas in Texas.

Michigan-Wisconsin produces no gas in Texas or elsewhere. Rather, it supplies its markets by purchasing gas from Phillips Petroleum Company. Through a network of pipe lines, Phillips brings natural gas from the wells from which it is produced to its Sherman gasoline plant located in Hansford County, Texas. At this plant, certain liquefiable hydrocarbons are removed from the gas, and, at the outlet side of the plant, Phillips sells the gas to Michigan-Wisconsin.

Under contracts between Phillips and Michigan-Wisconsin, Phillips obligates itself to deliver to Michigan-Wisconsin all of the requirements for the latter's pipe line, up to a maximum of 343 million cubic feet daily. To secure performance of this agreement, Phillips has dedicated all of the gas underlying certain lands described in the contracts, and, with minor exception, has agreed that it will sell no gas from such lands to anyone except Michigan-Wisconsin.

In these contracts, Phillips reserved the right to extract certain liquefiable hydrocarbons from the raw gas. This extraction is performed by Phillips with absorbers at its gasoline plant. When the gas leaves the absorbers it flows through pipes owned by Phillips for a distance of 300 yards to the outlet of the gasoline plant. When the gas emerges from the outlet, it flows directly into the pipe line of Michigan-Wisconsin, and it continues flowing through the Michigan-Wisconsin pipe line system until it reaches markets in other states.[5] This

---

at the rate of six per cent (6%) per annum from date due until paid.

"Unlawful to require producer
to pay

"Sec. 4. The tax imposed by this Act is a tax on the occupation of gathering gas and not on the production of gas; therefore, it shall be unlawful for any gas gatherer to require any producer to pay the tax imposed under this Act under any contract provision between the producer and the gas gatherer allowing the gatherer to deduct from sums owed the producer amounts paid by the gatherer by reason of the imposition of a tax on production. * * *

"Sec. 11. In the event the tax levied by this Section is declared unconstitutional or invalid by a court of competent jurisdiction as to gas gathered for interstate transmission, the tax shall not be levied as to gas gathered for intrastate consumption."

4. Section 8 of Article I of the Federal Constitution provides that Congress shall have the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". Cl. 3.

5. This gas after its delivery to Michigan-Wisconsin at the outlet of the processing plant travels through two 26-inch pipe lines a distance of approximately 1215 feet to a compressor station owned and operated by Michigan-Wisconsin at which station the pressure of such gas is raised from approximately 200 pounds to approximately 975 pounds. In the compressor station the gas is compressed, cooled, scrubbed and dehydrated in the course of the flow through the station. At the outlet of such compressor station, such gas passes into Michigan-Wisconsin's 24-inch pipe line, flowing through such pipe line approximately 1.74 miles

pipe line is in the State of Texas for only 1.74 miles, the remainder being in other states.

The movement of such gas from the producing wells to points of delivery to Michigan-Wisconsin at the outlet of the Phillips gasoline plant and thence through pipe lines to consumers in Michigan and Wisconsin is a steady and continuous flow. The taking of such gas at the outlet of the gasoline plant is accomplished through facilities owned by Michigan-Wisconsin and used exclusively by it in the taking and transportation of such gas.

All of the gas is purchased by Michigan-Wisconsin for transportation to points outside Texas, and all of such gas is in fact so transported.

It was further stipulated by the parties:

"Natural gas in going through a gasoline plant or other process to separate oil, gasoline or other liquid hydrocarbons or to extract hydrogen sulphide or carbon dioxide or any other element undergoes certain changes, both in quality and quantity. Among the changes are these: The residue gas leaving the extraction or separating device is usually at a lower pressure, the temperature is sometimes higher, and the specific gravity of the gas is less than that of the natural gas which enters such plant. There are differences between the proportion of the methane content, the ethane content and the content of other hydrocarbons. Likewise, when the hydrogen sulphide or carbon dioxide are extracted, there is a percentage variance in the constituents remaining in the gas. In addition to these changes in constituents, the volume of the residue gas is less than the volume of the natural gas which enters the extraction plant due to the removal of some of the constituents of the natural gas."

to the Texas-Oklahoma line and continuing through such pipe line to markets outside the State of Texas.

6. A schematic diagram of the operations of Michigan-Wisconsin and Panhandle is

Except for minor variations Panhandle conducts its activities in the same manner as Michigan-Wisconsin. Panhandle loads its interstate pipe line with gas from the outlets of three gasoline plants, rather than with gas from only one plant; it produces a portion of the gas which it takes at the outlet of one of such plants; and it makes sales in Texas to three small customers, rather than sending all of its gas outside the State.[6]

Amarillo produces no gas. It purchases gas produced in Texas and transports it by pipe lines in intrastate commerce only.[7]

Regarding the natural gas business in Texas it was stipulated that:

"But for the Texas oil and gas conservation statutes, and the enforcement by the Railroad Commission of Texas, producers in the field could drill as many wells as they desired and could open their wells at the rate of 100% open flow and could burn both the sweet and sour gas for the production of carbon black, or they could extract the gasoline and other liquid hydrocarbons in a gasoline plant and flare the residue gas. If this happened, the gas in the reservoir would become depleted in the course of a few years. If only a portion of the producers in the field drilled additional wells and operated such wells at 100% open flow, such producers would in the course of a few years drain the gas from under the acreage of the producers who were not also producing at 100% open flow from a proportionate number of wells. After such field should be depleted, neither Michigan-Wisconsin nor any other purchaser of gas could supply its market demand with gas from such fields and the same would be true with respect to any other field in the state which might be subjected to the same rapid depletion in the absence of the Texas

attached to and made a part of this opinion.

7. Amarillo's only ground of protest is based on Sec. 11 of Art. 7057f, copied supra.

oil and gas conservation statutes and the enforcement thereof."

Stipulated too was that the State of Texas exercises control and jurisdiction over the drilling, completing, and production of oil and gas wells, and over the plants that extract gasoline or other liquid hydrocarbons from gas, and that neither the Congress of the United States, the Federal Power Commission, nor any other Federal Agency has by any law, rule or regulation exercised any control or jurisdiction over such activities.

William James Murray, Jr., a petroleum engineer by profession and a member of the Railroad Commission of Texas, the state agency which enforces oil and gas conservation statutes, testified, without contradiction, at length regarding the special benefits conferred upon the gas industry by such statutes and their enforcement.

After recounting the successful efforts of the Railroad Commission in curtailing the flaring and wasting of gas [8] Mr. Murray was interrogated as follows:

"I would like for you to explain if it is a fact how the State of Texas, by virtue of the oil and gas conservation statutes and their enforcement by the Railroad Commission, has given any opportunities, if it has, and afforded any protection or conferred any benefits upon those who take or retain gasoline—gas at the outlet of a gasoline processing plant for transmission through pipelines? Has the State of Texas conferred any benefits or privileges to those people by virtue of its conservation laws? A. Yes, I think very material benefits.

"Q. Will you explain in detail what those benefits are? A. Well, partially my explanation would involve repetition of my statement earlier, that an interstate or intrastate pipe line must spend a tremendous amount of money in laying these fa-

cilities, and therefore, they have got to have assurance of long life reserves, and by preventing waste of gas, by increasing recovery of gas, we have given them the assurance of these long life reserves, which have made it possible for them to build the lines and for them to reap great profits from it. I could illustrate, back years ago when we were flaring so much gas from the Panhandle, you remember I mentioned at one time we were flaring a billion feet of gas a day, and here gas was just going to waste, and cities back East were very desirous, much in need of natural gas, but you couldn't afford to build a pipe line from the Chicago area, for example, to the Panhandle, even though the gas was so cheap they were just blowing it into the air instead of saving it. You could get your gas for nearly nothing, but you couldn't afford to build a pipe line down there because that field wasn't going to last long enough under the poor conservation practices to pay out the line, even though they could have been given the gas, and then when legislation and Commission regulation that wastage of gas was stopped, and it became apparent that when the reserves of the Panhandle were going to be required to be wisely utilized, they could then see that they had reserves for many years. We will talk in the terms of 25 years, and so a great number of gas pipe lines began to be built. I very keenly feel that conservation has made it possible, made it financially practical for these intercontinental, transcontinental pipe lines to come into business, and I trust I have made my answer clear in that phase. Now, after the day of stopping the flaring of gas, the Commission's regulation of casinghead gas, and our drive to stop the flaring of casinghead gas had gone hand in glove with the building of new

---

8. That Texas courts had a part in these efforts see Railroad Commission v. Shell Co., Inc., 146 Tex. 286, 206 S.W.2d 235, Railroad Commission v. Sterling Oil and Refining Co., 147 Tex. 547, 218 S.W.2d 415, and Railroad Commission v. Flour Bluff Oil Corporation, Tex.Civ.App., 219 S.W.2d 506 (Austin C.C.A., writ ref.).

interstate gas pipe lines to come get this casinghead gas. I regret I don't have in mind the reserves of the state, but nearly fifty per cent, if I recall correctly, of the gas reserves of this state is casinghead gas. Excuse me. There is nearly fifty per cent as much casinghead gas reserves as there is natural gas reserves. Well, there, when you start using casinghead gas instead of just blowing it to the air, look how tremendously you have increased the potential reserves of gas in Texas which are available to supply these interstate pipe lines, and the report of the Gas Conservation Engineering, on which I was privileged to serve, has been used in rather numerous Federal Power Commission hearings showing how much casinghead gas was being produced and flared down in Texas and how the Railroad Commission was planning to force the curtailment of that waste, and that therefore these reserves would be available for dedication to these pipe lines. * * *

"Q. Mr. Murray, I believe you stated that in your opinion, that in the absence of our state conservation laws and the enforcement by the Railroad Commission, that it would not have been economically feasible to have built a long line of pipe line to come in and get natural gas. I believe you stated that, didn't you? A. Yes, sir. * * *

"A. My answer was yes, that I had so stated, both that in my opinion, and historical events demonstrate that it was true that they could not build them in the absence of those regulations, and the pipe lines began to be built only after the regulations.[9]

"Q. I will ask you to state in your opinion what would the effect be upon those that are now taking and retaining the gas for transmission to the eastern and northern states, if the State of Texas repealed its conservation laws at this time or just failed to enforce them? A. If all of the oil and gas conservation laws were repealed or there was no enforcement of the laws, the effect on these pipe lines, in my judgment, would be to cause great loss of investment. I don't think any of the recently built pipelines which have not been paid out would ever be amortized, and there would be also a great suffering on the part of the consumers who are dependent upon these sources of supply of gas. * * *"

Another benefit accruing to purchasers of gas in Texas and credited to its regulation of the industry was that of making nominations for gas to satisfy market demand about which Mr. Murray testified:

"* * * In your opinion, Mr. Murray, does this privilege conferred upon takers of gas or the folks that are retaining gas for transmission in both interstate and intrastate commerce, to make nominations in order to measure the—meet their market demands, do you consider that a valuable right and privilege?

9. This latter statement was modified on cross-examination, Mr. Murray saying:

"I have previously explained my lack of clarity yesterday in my thinking and my understanding of just what we were restricted to, and I was largely discussing general principles as applicable to the State as a whole. I do not retract in the slightest the general statement that it is not feasible to build a transcontinental pipe line into an area where terrific waste will take place. I may have left the impression that no pipe lines were built into the Panhandle until after the waste had been stopped. I actually didn't have in mind the dates when all of the lines were built into the Panhandle, but a good many of those lines, as was brought out on cross-examination, were built prior to the beginning of the large amount of wastage in the Panhandle, and I can state that those lines would have been severely adversely affected, those lines already built, had the waste which began to occur after the lines were built had been allowed to continue. It is doubtful in my judgment whether the lines would ever have been able to amortize, if waste had continued at the maximum rate at which gas was wasted from the Panhandle Field."

"A. Oh, yes, very definitely, for the purchaser. The whole point of the nominations is to assure to the purchasers of gas within the limits of ratable take, that they will get the gas that they need. As far as the producer is concerned and the Commission is concerned, we could just set a fixed amount of gas each month and allow them to produce that amount of gas each month, it would be a whole lot easier on the producer and a lot easier on the Commission, but it wouldn't assure the purchaser the gas he wants, and so we go to a tremendous amount of trouble and calculations in order to see that always the purchaser is getting the gas that he wants. Consequently I do consider it a very valuable right and privilege, and if I might amplify my answer a while ago, the Legislature specifically for the benefit of the pipeline passed an over and under six months balancing provision, so that in the case I mentioned a while ago, while there was—say, the Carthage Field where there are several pipelines, if a producer doesn't happen to have connections to sufficient wells to give him as much allowable as he needs during a particular month, he can overproduce. The Legislature said that is all right, and the Commission says that is all right. It is kind of like an overdraft at the bank, and then the next month, if his demand has fallen off, he may have too much gas, and then he underproduces and makes up his overdraft, and he can overdraw for a period of six months, and then have six months in which to make it up. Now, if in the period of a year's time you don't balance out, why, then, we begin to start cutting them off, and say, 'Look, you just might as well get out and hustle you some more gas.' Just like your banker will take care of your overdraft for a while, but not indefinitely, but that has gone a long ways toward solving the problem of the Commission requirement that ratable take exists between the producers, and affording these various pipelines serving a single field the ability to get gas whenever their particular customers demand it, and I do consider that a very valuable right and privilege to the gas companies."

The point at which maximum benefits of State regulation was attained was fixed by Mr. Murray as being at the outlet of the processing plant, his testimony in this regard being:

"In the case of either gas well gas or casinghead gas that is processed in a plant for the extraction of gasoline or other liquid hydrocarbons, at which place could such gas be taken or retained by a person for transmission so that the person so taking or retaining for transmission would receive the maximum benefit of whatever benefits he does receive from the enforcement of our state oil and gas conservation statutes? A. Well, I would say obviously the maximum benefit would be at the outlet of the plant, because the plant itself operates under the Commission's conservation regulations, and benefits accrue from these regulations of the operation of the plant, and so my answer the point at which the maximum benefits occur would be after the gas has been finally processed through the plant, at the outlet of the plant.

"Q. Where gas is produced and flows from the well head to a plant that separates the gasoline or other liquid hydrocarbons therefrom, where is the first place that gas could be taken or retained for transmission that such gas is in the best or proper condition to be transmitted by a pipeline for any considerable distance? A. Well, now, I am assuming from your question by the fact that the gas is processed in a plant that it needs to be processed in a plant, and consequently gas which has sufficient liquid content that it requires processing isn't in suitable condition for long distance transportation until it has been processed, and therefore it obviously follows that the first time the gas is suitable for transmission, bearing in mind I am predicating it on it being wet gas to start

with, is after it has been processed through a plant. Now, by further explanation that there are dry gas wells which do produce gas that is suitable in its condition as it comes from the well head to be transmitted through a pipeline, but you don't process that kind of gas in a gasoline plant; so when you told me that it was being processed, it obviously followed that it is only suitable for transmission after it has been processed.

"Q. You said after it has been processed. Do you mean by that at the outlet of the gasoline plant? A. Yes, sir, at the outlet of the gasoline plant."

So much for the facts.

The law will now be inquired into and our conclusions stated as briefly as possible. This we do with full knowledge that the only forum having ultimate and exclusive jurisdiction to authoritatively determine the issue before us is the Supreme Court of the United States.

Our conclusions, presently to be stated, have been reached after a painstaking study of all the Federal Supreme Court decisions which have been cited by the parties. None of these cases is factually in point. This case then must turn upon a practical application of basic principles adduced from these authorities to the facts. As stated by the Court in Union Brokerage Company v. Jensen:[10]

"We have considered literally scores of cases in which the States have exerted authority over foreign corporations and in doing so have dealt with aspects of interstate and foreign commerce. Whatever may be the generalities to which these cases gave utterance and about which there has been, on the whole, relatively little disagreement, the fate of state legislation in these cases has not been de-termined by these generalities but by the weight of the circumstances and the practical and experienced judgment in applying these generalities to the particular instances. To review them to any extent would be writing the history of the adjudicatory process in relation to the Commerce Clause."

Similarly in Utah Power & Light Co. v. Pfost:[11]

"* * * we must not lose sight of the fact that taxation is a practical matter, and that what constitutes commerce, manufacture, or production is to be determined upon practical considerations."

The problem of the federal courts in this field of litigation has been "to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed."[12]

■ It is certain that the State may not for revenue purposes levy a direct tax upon the privilege of engaging in interstate business.[13]

■ It is equally certain that:

"[But] it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business, Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 [826], 115 A.L.R. 944. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the

10. 322 U.S. 202, 64 S.Ct. 967, 973, 88 L. Ed. 1227.

11. 286 U.S. 165, 52 S.Ct. 548, 551, 76 L. Ed. 1038.

12. McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 393, 84 L.Ed. 565.

13. Spector Motor Service v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573. However, money payments burdening interstate commerce may be exacted by the State as reimbursement for providing facilities and enforcing lawful regulations of commerce. Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653.

play of economic forces, affect interstate commerce, which ·nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress."[14]

After referring to various decisions the Court continued:

"In few of these cases could it be said with assurance that the local tax does not in some measure affect the commerce or increase the cost of doing it. But in them as in other instances of constitutional interpretation so as to insure the harmonious operation of powers reserved ·to the states with those conferred upon the national government, courts are called upon to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed."

■■ In Memphis Natural Gas Co. v. Stone,[15] it was said:

"The federal courts have sought over the years to determine the scope of a state's power to tax in the light of the competing interests of interstate commerce, and of the states, with their power to impose reasonable taxes upon incidents connected with that commerce. See Gwin, White & Prince v. Henneford, 305 U.S. 434, 441, 59 S.Ct. 325, 328, 83 L.Ed. 272 [277]. We continue at that task, characterized long ago as an area of 'nice distinctions.' * * *

"The cases just cited in the note show that, from the viewpoint of the Commerce Clause, where the corporations carry on a local activity sufficiently separate from the interstate commerce state taxes may be validly laid, even though the exaction from the business of the taxpayer is precisely the same as though the tax had been levied upon the interstate business itself. But the

choice of a local incident for the tax, without more, is not enough. There are always convenient local incidents in every interstate operation. Nippert v. City of Richmond, supra, 327 U.S. [416] at [page] 423, 66 S.Ct. [586] 589, 90 L.Ed. [760] 764 [162 A.L.R. 844]. The incident selected should be one that does not lend itself to repeated exactions in other states. Otherwise intrastate commerce may be preferred over interstate commerce."

and the Court concluded:

"We think that the state is within its constitutional rights in exacting compensation under this statute for the protection it affords the activities within its borders. Of course, the interstate commerce could not be conducted without these local activities. But that fact is not conclusive. These are events apart from the flow of commerce. This is a tax on activities for which the state, not the United States, gives protection and the state is entitled to compensation when its tax cannot be said to be an unreasonable burden or a toll on the interstate business."

In Spector Motor Service v. O'Connor,[16] it is said:

"It is not a matter of labels. The incidence of the tax provides the answer."

■ The incidence of the tax here is, according to the statute, the gathering of gas, defined to be:

"* * * the first taking or the first retaining of possession of gas produced in Texas for transmission whether through a pipe line, either common carrier or private, or otherwise after severance of such gas, and after the passage of such gas through any separator, drip, trap, meter or other method designed to separate the oil therefrom. In the case of gas con-

---

14. McGoldrick v. Berwind-White Coal Min. Co., 309 U.S. 33, 60 S.Ct. 388, 392, 84 L. Ed. 565.

15. 335 U.S. 80, 68 S.Ct. 1475, 1477, 92 L.Ed. 1832.

16. 340 U.S. 602, 71 S.Ct. 508, 512, 95 L. Ed. 573.

5

taining gasoline or liquid hydrocarbons that are removed or extracted at a plant within the State by scrubbing, absorption, compression or any other process, the term 'gathering gas' means the first taking or the first retaining of possession of such gas for other processing or transmission whether through a pipe line, either common carrier or private, or otherwise after such gas has passed through the outlet of such plant."

That the gathering of gas, so defined, is a local activity within the State of Texas and not subject to repetition elsewhere is apparent and since appellees do not allege the statute to be discriminatory, the sole question is whether such local activities are so closely related to and such an integral part of the interstate business of appellees who transport gas in interstate commerce as to be within the scope of the Commerce Clause of the Constitution.

Considered from a practical point of view, we think not.

If the incidence of the tax here was the production of gas there would be no question about the validity of the statute.[17] The tax here is not so laid. In fact the statute makes unlawful the saddling of this tax upon the producer. The reason for this is to be partly found in references in legislative debates to the "already overtaxed landowner, royalty owner and producer."[18] This situation could only result from long term commitments to sell gas at low prices, otherwise the Legislature would not have been so solicitous for the welfare of the producer for if the producer could pass on to the consuming public a tax increase then his position would not be one of hardship.

If on the other hand the Legislature was impotent to levy a tax relating to this gas because, as appellees contend, it "is in interstate commerce from the time it leaves the mouths of the wells" then the only legislative alternative was to levy an additional production tax without regard to the disastrous effect which might be visited upon producers.

■ There is nothing illegal nor immoral in the enactment of tax laws with the knowledge and expectation that those upon whom the tax initially falls will make recoupment from others.[19] Most excise taxes are of this nature and unless they can be passed on to the consumer the manufacturer or producer could not long survive.

Of course landowners and producers of gas could have protected themselves by contract but when gas was so worthless as to be flared at the rate of a billion cubic feet daily from one Texas field it is small wonder that producers and owners did not quibble over contract terms when anything at all was offered for their gas.

■ We also have the firm conviction that the power of the State, employed through the exercise of legislative discretion, to select local incidents related to interstate commerce for the purpose of taxation should not be limited or defined by the physical properties or characteristics of the subject matter which in this instance is natural gas.

As we view it these characteristics form the basis for appellees' conclusions that the gas here moves in a continuous flow from the mouths of the wells in interstate commerce. The same reasoning could send the interstate commerce label down the well and into subterranean chambers where the movement of gas actually commences. The mouth of the well is merely an arbitrary point along the road traveled by the gas. There is no legal reason known to us for fixing the mouth of the well as the dividing line separating State and Federal jurisdictions in matters of commerce and taxation.

It is the nature of gas, since it is lighter than air, to move when relieved of pressure. Stationary gas has no utilitarian value. Such value is attained only when gas moves in a steady and continuous flow. Nor can gas be economically stored except in its natural reservoirs. The movement of gas

17. Hope Natural Gas Company v. Hall, 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049.

18. House Journal, June 1, 1951, p. 3350.

19. Texas Company v. Brown, 258 U.S. 466, 42 S.Ct. 375, 66 L.Ed. 721.

has no necessary relation to interstate commerce or to commerce at all. It moves, willy nilly, if not contained.

A similar problem was solved by the Court in Utah Power & Light Co. v. Pfost[20] where it was held that generation of electricity was a local activity not inseparably related to its transmission, the Court saying:

> "While conversion and transmission are substantially instantaneous, they are, we are convinced, essentially separable and distinct operations. The fact that to ordinary observation there is no appreciable lapse of time between the generation of the product and its transmission does not forbid the conclusion that they are, nevertheless, successive and not simultaneous acts."

Here there is contractual interference with the transmission of the gas in interstate commerce until after the gas has emerged from processing plants as well as actual interference caused by the processing itself.[21] That there is no appreciable lapse of time between processing of the gas, the taking or retaining of the gas and its transmission is, as we have seen, unimportant since they are successive and not simultaneous acts.

■ We believe that the tax levied by this statute is fairly commensurate with the protection and benefits conferred by the State upon those engaged in the occupation described. We also believe that this statute represents an exercise of legislative discretion with which the Constitution of the United States does not require and the courts should not command interference. The statute, to us, seems to reflect a sincere effort on the part of the Legislature to deal fairly and justly with the State, its citizens and with all others who share in the enjoyment of one of the great though vanishing, exhaustible and irreplaceable natural resources of the State of Texas.

■ In passing upon the question before us we have borne in mind the admonition of Chief Justice Marshall that:

> "The question, whether a law be void for its repugnancy to the Constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."[22]

■ We have no clear or strong conviction that this statute and the Constitution are incompatible.

The statute does not purport to, was not designed to and in fact does not interfere with the authority of Congress to regulate interstate commerce.

■ All that truthfully can be said of the statute is that it increases the cost of gas to the consuming public. There are few if any ad valorem, privilege or excise taxes which do not have similar effect in their respective fields. This, however, is not a defect.

■ The taxable event described by the statute, as to Michigan-Wisconsin, occurs between processing conducted by Phillips and further processing done by Michigan-Wisconsin in the State of Texas, all prior to the time that the gas is finally committed to its interstate journey. Such event, that is the taking or retaining of the gas at the gasoline plant outlet, is just as local in nature as the production itself is

20. 286 U.S. 165, 52 S.Ct. 548, 551, 76 L. Ed. 1038.

21. In Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 529, 67 L.Ed. 929, the Court said: "The ore does not enter interstate commerce until after the mining is done * * *."

22. Fletcher v. Peck, 6 Cranch 87, 3 L. Ed. 162.

local. The judicial consequences in each instance should be the same. We believe they are the same.

It follows that, in our opinion, the statute is valid.

The judgment in each of these cases is reversed and judgments are here rendered that the respective plaintiff therein take nothing by its suit.

Reversed and rendered.

APPENDIX "B"

## PANHANDLE EASTERN PIPE LINE COMPANY

GATHERING AND
TRANSMISSION SYSTEM
IN STATE OF TEXAS

LEGEND OF NUMERIC
AND
ALPHABETIC DESIGNATION

| | |
|---|---|
| 1–3 | Points of "Taking" (or Retaining) Residue Gas |
| 4–7 | Points of "Taking" Raw Gas From Gathering System |
| $B_1$ | Field Use (Direct Company Operation) |
| $B_2$ | Field Use (Lease Hold Obligation) |
| $B_3$ | Field Use (Right-Of-Way Obligation) |
| $B_4$ | Field Use (Including Line Loss) |
| D | For Manufacture (Carbon Black) |

LEGEND OF SYMBOLS

☐ P. E. P. L. Compressor
▨ Gasoline Plant
⊕ Point of Purchase
→ Field Delivery (For Use, Sale, or Loss)

SCHEMATIC LAYOUT

MICHIGAN – WISCONSIN PIPE LINE COMPANY — PHILLIPS PETROLEUM COMPANY